IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAURICE BERNARD STEWART, JR.,     \*
     Plaintiff

                         \*   CIVIL ACTION NO. JFM-15-1287
  V.

                         \*

MARYLAND DIVISION OF CORRECTION,
et al.,                                 \*

     Defendants             \*
                          \*\*\*\*\*\*

MAURICE BERNARD STEWART, JR.,     \*
     Plaintiff

                         \*   CIVIL ACTION NO. JFM-15-3009
  V.

                         \*

FRANK BISHOP, et al.,

                         \*

     Defendants
                         \*\*\*\*\*\*\*

## MEMORANDUM

On May 5, 2015, Maurice Stewart a prisoner confined at the North Branch Correctional Institution (NBCI) filed Civil Action No. JFM-15-1587 (Stewart I) alleging that defendants failed to protect him from a known risk of harm. ECF 1. Stewart alleged that he is the subject of a gang hit and that on September 29, 2014, he was assaulted by his cellmate, a member of a prison gang. *Id.*

On October 5, 2015, Stewart filed Civil Action No. JFM-15-3009 (Stewart II), alleging that he sought and was denied protective custody. ECF 1, p. 3. Stewart reiterated his claim that he is at a high risk of victimization and that he was sexually assaulted on September 29, 2014. *Id.* He indicated that the case was separate and distinct from Civil Action No. 15-1287 and as such a new case was opened. ECF 1-1. He later added allegations that he was assaulted by a different cellmate in October of 2015. ECF 8.

1

Case 1:15-cv-03009-JFM   Document 24   Filed 02/16/17   Page 2 of 28


Both cases proceeded for response by defendants. Given the overlapping factual allegations and defenses, consolidation for dispositive review is appropriate.

## I. Procedural Posture

Pending in Stewart I is a supplemental motion to dismiss, or in the alterative for summary judgement, filed on behalf of defendants Warden Frank B. Bishop, Jr., Maryland Division of Correction, Lt. Bradley Wilt, Lt. Janet Puffenbarger, Sgt. Nicholas Soltas, Mark Carter, Detective Sgt. Scott Peterson, Norma Holwager, and C.O. II Jason Frantz.[1] ECF 61, supplementing ECF 32 & 47.[2]  Plaintiff Maurice Stewart has responded. Stewart I, ECF 34,[3] 41, 50, 51, 63-66.

Pending in Stewart II is a motion to dismiss, or in the alterative for summary judgement, filed on behalf of defendants Mental Health Professional Counselor-Advanced Bruce Liller, CCMS II Charlotte Zies, Social Worker I Monica Wilson, CCMS II Shayla Lease, and Lt. Bradley Wilt.[4]  Stewart II, ECF 21. Stewart was informed by the court, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), that the failure to file a response in opposition to the motion filed by defendants could result in dismissal of the complaint. ECF 22. Stewart has failed to file anything in opposition.

Upon review of papers and exhibits filed, the court finds an oral hearing in these matters unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, the dispositive motions will be granted.

---

[1] The Clerk shall amend the docket to reflect the correct names of defendants.

[2] Defendant Beachy has not been served with the complaint. Plaintiff's complaint against Beachy shall be dismissed without prejudice. *Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

[3] To the extent plaintiff's opposition responses filed in Stewart I raise new claims not properly before the court, they shall not be considered, e.g., claims regarding his return to NBCI on June 20, 2014 (ECF 34, p. 4),  conflict with other cellmates (ECF 34), denial of adequate psychological care (ECF 34, p. 10), complaints of transport to and from court proceedings (ECF 37, p. 2), interference with his use of the telephone (ECF 49), and failure to notify family of an emergency situation (ECF 66).

[4] The Clerk shall amend the docket to reflect the correct names of defendants

2

## II. Plaintiff's Claims

A.      **Stewart I (Civil Action No. JFM-15-1287)**

On May 5, 2015, Stewart filed a self-represented complaint alleging that defendants failed to protect him from an assault by another inmate. Stewart I, ECF 1. Specifically, Stewart states that since April of 2012, he has complained to Maryland Division of Correction staff that the Black Guerilla Family ("BGF") placed a hit on his life. *Id.*, p. 1. Stewart states that prison staff continue to house him with BGF gang members, despite their making repeated attempts on his life. *Id.*, p. 2. Stewart states that prison staff continually lie to the court, indicating that there is not a hit on his life. *Id.*

In August or September of 2014, he wrote to Warden Bishop advising him that his life was in danger by gang members and he was at a high risk of being victimized in a double cell due to the hit placed on him and to his suffering from cancer which caused him to be weak. *Id.*, p. 2; ECF 34, p. 7. Stewart alleges that these complaints were disregarded by Bishop and Lt. Wilt. ECF 1, p. 2.

Stewart states that on September 29, 2014, he was taken to Wilt's office and advised that he was going to be placed into a double cell with BGF member Eric Bogues. *Id.*, p. 3; ECF 34-2, ¶ 4. Stewart advised Wilt that his life was in danger and he did not want to cell with Bogues. *Id.* Wilt told Stewart he was tired of his crying wolf and he would have to lock in with Bogues. *Id.* Wilt ordered Officers Puffenbarger and Soltas to take Stewart to the cell. *Id.*

While being escorted to the cell, Stewart claims that Soltas told him that Bogues was going to "fuck [him] up." ECF 1, p. 3; ECF 34-2, ¶ 4. Puffenbarger and Soltas forced Stewart into the cell while he remained handcuffed, in violation of policy, and while Bogues was not handcuffed. *Id.*; *see also* ECF 12, p. 1; ECF 34-2 ¶ 4. Bogues attacked Stewart, severely beating

3

him while officers made security rounds on the tier, ignoring Stewart's cries for help. ECF 1, p. 4; ECF 34-2 ¶¶ 5 & 6; ECF 10, pp. 1-2; ECF 12, p. 1;  ECF 22, pp. 1-2.

Stewart claims that what seemed hours later he was escorted to the medical treatment room. Officers forced Stewart to walk even though it was evident he was severely injured and in need of a stretcher. ECF 1, p. 4,  He also claims that he needed a cane to walk and despite this need he was handcuffed behind his back. ECF 34-2, ¶ 8.

Once in the medical room he was evaluated by Dr. Ava Joubert and Registered Nurse Kimberly Martin. ECF 1, p, 4. While in the medical room defendants Wilt, Puffenbarger, Soltas, Beachy, and Frantz taunted and laughed at him regarding his being beaten by Bogues. ECF 34-2, ¶ 9.

Stewart was sent to the Western Maryland Health System Emergency Room where he was diagnosed with a concussion, "damage to a disc in [his] jaw," neck sprain, swelling, trauma, bruised ribs, and his kidneys were damaged. ECF 1, p. 5. Stewart states he was admitted to the hospital where he remained for a week.  *Id.*

After the assault, Stewart claims he was threatened daily by correctional staff.  *Id.*; ECF 34-2, ¶ 16. He indicates that he later learned that officers approached Bogues before Stewart was placed in the cell and paid him extra food and contraband to "take out a hit on [him]." ECF 1, p. 5. Stewart claims that Bogues and correctional staff have each put a "hit" on his life. ECF 34-2, ¶¶ 14 & 15.

Stewart indicates that Bogues was never added to his enemy list. ECF 34, p. 20, *see also* ECF 34-1, p. 50. (enemy alert dated 8/27/15 Bogues not listed although names are blacked out). He claims that Bogues is in receipt of the report Stewart made against him and has passed it out to other inmates and is orchestrating efforts to harm him. ECF 34, pp. 26-27; ECF 34-1, p. 51. He

alleges that Bogues wrote to an attorney seeking legal assistance and revealed that officers paid him to take a "hit" on him.  ECF 34, pp. 17; ECF 34-1, p. 32.[5]  He claims that the failure to add Bogues to his enemies list is evidence of the conspiracy among correctional staff to cause him harm.  ECF 34, pp. 27-28; ECF 34-2, ¶ 17.

As relief, Stewart seeks an injunction directing he be housed in a single cell and/or transferred out of the state of Maryland.  ECF 1, p. 6.  He also seeks a federal investigation and that he be transported alone in all vehicles.  *Id.*, pp. 6, 8.  He seeks compensatory damages.  *Id..* p 6.

Stewart has provided affidavits from fellow inmates.  ECF 6.  Courtney Campbell avers that he witnessed unnamed correctional staff threatening Stewart's life, including one officer calling Stewart, "Michelle."  ECF 6, p. 2.  Campbell also avers that he heard correctional staff say plaintiff was "dead" when he was in fact in the infirmary.  *Id.*  Jean Germain avers that he overheard unnamed correctional officers threaten other inmates by saying they would pay another inmate to "beat your ass just like we did with Stewart."  *Id.*, p. 3.  Antonio Banks[6] avers that he "witnessed the correctional officers and other staff abuse inmate Maurice Stewart and other inmates...."  *Id.*, p. 5.  Banks also avers that officers poison inmates' food at NBCI and that he knows this because he too has been poisoned by staff.  *Id.*  Stewart avers that on an unspecified date he overheard unnamed correctional officers telling his cellmates to murder him in his sleep.  ECF 34-2, ¶ 3.

_____

[5] The attachment is a letter from Bert W. Kapinus, Esquire to plaintiff indicating he received a letter from Eric Bogues who stated that  "on September 29, 2014, [plaintiff was] forced into Mr. Bogues' cell and ordered to fight him by the Correctional  Officers.  Mr. Bogues goes on to say that he was told if he would fight they would pay him with extra food."  ECF 34, p. 32.  The letter from Bogues to Kapinus is not attached.

[6] In a letter to the court, Stewart indicates that Banks advised him that he was going to attempt to have plaintiff's case dismissed.  Stewart states "Note: Inmate Banks is a mentally ill inmate" and advises the court he does not intend to dismiss the instant complaint.  ECF 8.

Plaintiff states that he advised Social Worker Wilson and Psychology Associate Holwager that he had a gang hit on him and could not be double celled but they did nothing to assist him. ECF 10, pp. 5-6; ECF 15; ECF 34-2, ¶ 1 (Stewart Declaration). Stewart provides a social work department memo which indicates that during a screening by his case manager he was identified as at a "higher risk for victimization" and asking if Stewart desired to meet with a mental health professional. ECF 34-1, p. 49; ECF 39, p. 2. Stewart indicated his desire to meet with a social worker on October 31, 2014. *Id.*

The September 29, 2014 assault was investigated by Detective Peterson of the Internal Investigation Unit ("IIU"). ECF 12, p. 3. Peterson and the Assistant State's Attorney Michael Twigg refused to press charges against any correctional officers regarding the assault despite Stewart's claim that he asked Peterson to do so and advised Peterson of his allegations against correctional staff. *Id.*; *see also* ECF 15, p. 3; ECF 34, p. 15; ECF 34-2, ¶ 11.

Stewart wrote to Mark Carter, Executive Director of the IIU seeking records of the assault and investigation under the Maryland Public Information Act but he never received the records. ECF 15, p. 4; ECF 34-2, ¶ 12. In his opposition response Stewart indicates that he no longer has a claim against Carter because defendants provided him copies of the IIU file. ECF 50, p. 2.

**B.     Stewart II (Civil Action No. JFM-15-3009)**

In Stewart II (Civil Action No. JFM-15-3009), Stewart alleges that he submitted letters to Warden Bishop, Lt. Wilt, and Bruce Liller, psychology supervisor, asking them to fill out paperwork for him to be assigned to protective custody. Stewart II, ECF 1, p. 3. Stewart says that his requests have been deliberately ignored and disregarded. He indicates that he has received paper work identifying him as at a "higher risk of victimization." *Id.* Stewart claims that defendants are aware he was sexually assaulted on September 29, 2014, but refuse to keep

6

him separate from other inmates.  He claims they are in violation of the Prison Rape Elimination Act (PREA).  *Id.*, p. 4.  Stewart states that he is paranoid being around other inmates and has difficulty being in close proximity to other people.  *Id.*

Stewart states that he has requested Case Managers Shayla Lease and Charlotte Zies document in "the database" that he is at higher risk of victimization and should be put on protective custody and placed in a single cell.  *Id.*, p. 4.  He states that case managers regularly review his base file and are aware he was assaulted on September 29, 2014, but refuse to document that he should be on single cell status. *Id.*, p. 5.

Stewart claims that he was advised by Officer Bounds that at the expiration of his disciplinary segregation sentence he would be placed in a double cell as there was no documentation requiring he be on protective custody or single cell status.  *Id.*

Stewart indicates that he has been in counselling sessions with Monica Wilson, a social worker.  He has advised her that he is paranoid being around other people, including inside a double cell.  *Id.*, p. 6.  Wilson is aware Stewart suffers from post-traumatic stress disorder arising from the September 29, 2014 assault but refuses to ensure that he is provided protective custody and single cell status.  *Id.*, p. 6.  Stewart indicates his belief that correctional staff are attempting to "set him up" by double celling him so that another inmate can attack him.  *Id.*, p. 7.

Stewart was taken for segregation review on October 15, 2015.  ECF 8, p. 1.  He reported that he feared for his safety in a double cell and that Bogues, the assailant in the September 29, 2014 attack, had been convicted of the assault resulting in additional prison time.  Stewart claimed Bogues was passing around, within NBCI and throughout other Maryland prisons, the statement Stewart provided during the IIU investigation of the assault.  *Id.*, pp. 1-2.

Stewart was assigned to a cell with inmate Tremaine Kitchen. *Id.*, p. 2. Stewarts states that Kitchen choked him and sexually assaulted him on October 16, 17, and 18, 2015. *Id.* Stewart states that he waited to report the assaults until October 18, 2015, when he was away from Kitchen. *Id.* Stewart was taken to the medical unit and transported to the Western Maryland Regional Medical Center ("WRMC") where he was examined. Stewart states that the medical examination revealed he "suffered a torn anus & substantiated the sexual assault." *Id.*, p. 3. He alleges that Janet Puffenbarger, Bryan Hoffman and Charles Bielanski failed to protect him by forcing him to share a cell with Kitchen. *Id.*, p. 4.

### III. Defendants' Response

#### A.   Stewart's history of assault claims

Warden Bishop avers that Stewart's numerous claims of victimization have been investigated. Stewart II, ECF 21-2, ¶ 5. Since 2010, Stewart has claimed he was the victim of a physical or sexual assault on seven occasions. Stewart I, ECF 61-6. None of Stewart's specific claims about being the victim of sexual assault were substantiated. ECF 61-3, ¶ 6. Investigation of IIU 10-35-01289 revealed that inmate Chaka Franklin received a criminal sentence of 18 months for assault on Stewart occurring in 2010. ECF 61-7, p. 8. There was no indication that a sexual assault occurred. *Id.* Investigation of IIU 14-35-00091 concerning plaintiff's allegation that he was sexually assaulted by Shawn Joyce on January 24, 2014, found the claims unsubstantiated. ECF 61-8, p. 8. Investigation of IIU 14-35-00621 regarding the alleged sexual assault by plaintiff's cellmate Danzel Carter on June 11, 2014, was also not substantiated. ECF. 61-9, p. 9. Investigation in IIU 14-35-00859 concerning the alleged rape of plaintiff by his cellmate David Chatham in August of 2014 was also unsubstantiated. ECF 61-10, p. 14. Investigation of IIU 14-35-00969 concerned plaintiff's claim that his cellmate Robert Moore

stabbed him. ECF 61-11. The investigation revealed that Stewart entered a shower unmarked and left the shower with superficial stab marks. Plaintiff tried to hide a homemade knife. *Id.*, pp. 3-4. The investigation suggested that plaintiff stabbed himself and accused his cellmate. *Id.* Investigation of IIU 14-35-00994 concerns the assault at issue in Stewart I. ECF 32-3, p. 5. Bogues was charged with assault as a result of his attack on Stewart. The sexual assault allegation was unsubstantiated. *Id.* The matters investigated in IIU 15-35-01484 are at issue in Stewart II, *see* ECF 21-8, and involve allegations that Stewart was sexually assaulted by his cellmate Tremaine Kitchen; claims which were again unsubstantiated. Stewart I, ECF 61-16, ¶ 10. IIU 10-35-00785 concerned a welfare check due to plaintiff's claim that gangs wanted to harm him and his family. ECF 61-12, p. 2. The claims were investigated and found to be unsubstantiated. *Id.*

Although plaintiff claimed to have been assaulted on numerous occasion since 2010, only the 2010 assault by Chaka Franklin was verified, prior to the 2014 assault by Bogues. Defendants have provided Stewart's Prison Rape Elimination Act (PREA) screenings. ECF 61-5, ¶ 5 & pp. 3-4, 6-8). The screening information is self-reported. ECF 61-5, p. 2. At times Stewart has scored as being at risk for victimization, and he has been provided follow up mental health care, while at other times he scores as being at risk for being abusive. ECF 61-5, pp. 3-8; ECF 61-3, ¶ 7. Each of Stewart's PREA claims has been immediately investigated. Stewart II, ECF 21-7, ¶ 3. Stewart's belief that he is at a higher risk of victimization likely stems from the PREA claims and self-assessment forms. *Id.*, ¶ 4.

Defendants provide information regarding Stewart's assignment to administrative segregation form 2010 to September 29, 2014. Stewart I, ECF 61-17, ¶ 5. Administrative segregation is a means of separating an inmate from the general population. *Id.*, p. 6.

Assignment to administrative segregation can occur for 6 enumerated reasons as well an un-enumerated reason, provided by the staff who initiates the placement. *Id.*

Stewart's base file shows that he was placed on administrative segregation in regard to the following claims of assault: 1) alleged sexual assault by Danzel Carter on or about June 12, 2014-after investigation the allegations were found to be inconclusive (*id.*, pp. 6-7);  2) alleged rape by Shawn Joyce on January 24, 2014-after investigation the claim was found to be without merit (*id.*, pp. 9-14); 3) alleged sexual assault by Chaka Franklin on or about October 9, 2011 (*id.*, pp. 27-28)-after investigation (ECF 61-18) Franklin was charged and plead guilty to the assault but was not charged with a sexual offense. ECF 61-17, p. 23.

Stewart was also assigned to administrative segregation on a number of occasions due to enemy situations. Stewart has 17 identified enemies in the DOC. ECF 32-4, ¶ 3. On February 8, 2010, he was assigned to administrative segregation at NBCI due to enemies at NBCI. He remained on administrative segregation until the end of May when his disciplinary segregation sentence was due to end and he was scheduled for an administrative transfer to WCI due to enemies at NBCI. ECF 61-17, pp. 30-32. On October 9, 2011, plaintiff was assigned to stay on administrative segregation due to enemies at NBCI. *Id.*, pp. 19-21. Plaintiff was transferred to WCI on June 28, 2012, where he remained on administrative segregation and then was re-assigned to disciplinary segregation when his enemy left WCI. *Id.*, p. 16.

Stewart has been in a single cell since October 19, 2015. ECF 61-16, ¶ 11. He is assigned to "recreation alone/cell alone" status. *Id.*, ¶ 12. Warden Bishop avers that absent a reason warranting a change in his placement, while housed at NBCI he will remain on single cell status. ECF 61-3, ¶ 8.

B.     **Claim regarding BGF "Hit"**

Lt. Jason Harbaugh of the NBCI Intelligence Department avers that he has been assigned to NBCI intelligence since October 2013 and is its current supervisor. ECF 32-4, ¶ 2. The NBCI Intelligence Department investigates prison gangs, known as security threat groups (STG), to assess and assist in preventing STG violence within the prison. *Id.* & ECF 61-15, ¶ 2. Harbaugh indicates that a variety of investigative techniques are used including sharing intelligence throughout DOC facilities and coordinating intelligence gathering with federal, state and local agencies. Additionally, intelligence is gained in part by interviewing confidential sources and gang members. *Id.* STG are constantly monitored to assess and assist in preventing violence within the prison. ECF 61-15, ¶ 2.

Harbaugh indicates that NBCI has received no credible information that Stewart has been on any STG hit list or under threat of assault by the BGF or any other gang. ECF 32-4, ¶ 3; ECF 61-15, ¶ 3. Harbaugh reviewed Stewart's base files, which showed a number of allegations including claims of staff abuse and neglect, medical requirements and concerns, claims of sexual abuse, as well as fear regarding STG hits. *Id.* None of Stewart's claims have been substantiated. *Id.*

C.     **September 29, 2014 assault**

Defendants in Stewart I (Civil Action No. JFM-15-1287) indicate that on the date of the September 29, 2014 assault, the Maryland Department of Public Safety and Correctional Services (DPSCS) Intelligence and Investigation Division ("IID") (formerly Internal Investigation Unit) initiated an investigation as to plaintiff's claims of assault. ECF 32-3, p. 7. The investigation revealed that on September 29, 2014, Officer Shawn Murray responded to a possible fight and found Stewart seated in the cell he shared with Bogues. Stewart claimed his back and arm hurt.

11

*Id.*, p. 10. Murray escorted Stewart to Housing Unit 1's medical examination room. Dr. Joubert indicated that Stewart stated he was beaten by his cellmate, he fell unconscious for a minute and when he awoke, his cellmate held a deodorant bottle and said he put it inside Stewart's rectum. *Id.* Joubert directed Stewart be sent to WRMC for further treatment. He was admitted to the hospital and treated for a number of injuries including closed head injury, cardiac contusion, bilateral subconjunctival hemorrhages, multiple contusions and abrasions. *Id.*, pp. 11-13.

IID Detective Peterson interviewed Stewart on September 29, 2014 at WRMC. *Id.*, p. 9. Stewart reported that after he and Bogues ate their lunch in the cell, Bogues started to punch and kick him. *Id.*, p. 7. Prior to the assault, Stewart heard Bogues yell across the tier to another inmate who offered to pay Bogues to "fuck [plaintiff] up." *Id.* Stewart stated that he lost consciousness briefly during the attack. When he awoke Bogues was holding a shampoo bottle and said, "This motherfucker been saying he was sexually assaulted, now he is getting sexually assaulted." *Id.* He was not sure whether a sexual assault occurred. He indicated his desire to press criminal charges against Bogues and later indicated he was not concerned with the sexual assault. *Id.*, pp. 7, 10.

Bogues refused to talk to the detective about the incident. *Id.*, p. 11. The cell was searched and blood spatter found on the interior cell door. *Id.* No shampoo bottle was found. *Id.* Bogues' clothing was taken by the detective as evidence. *Id.*

Peterson determined that Bogues was not a validated member of a security threat group ("STG").[7] *Id.*, p. 13. Bogues had one tattoo associated with the BGF which it appears he subsequently attempted to cover with a newer tattoo.[8] ECF 61-21, ¶ 6. Bogues was a validated

---

[7] Stewart maintains his belief that Bogues is a member of the STG, BGF. ECF 34, pp. 1-2.

[8] Stewart notes that at the time of the assault there was no effort to cover the tattoo. ECF 65.

12

member of the BGF on June 18, 2009.  He showed no further STG activity since that date and pursuant to federal regulations regarding validation of STGs Bogues is no longer a validated STG participant.  On an unspecified date his name was removed from GangNet, a multijurisdictional gang database. *Id.*

Criminal charges were filed against Bogues on October 2, 2014.  ECF 32-3, p. 13.  He was convicted in the Circuit Court for Allegany County, Maryland and received a five year sentence with two years suspended.  ECF 61-5, ¶ 6, Maryland Judiciary Case Search, ECF 61-5, pp. 42-49.  Bogues was subsequently added to Stewart's enemy lists.[9]  ECF 61-16, ¶ 9; ECF 61-16, p. 39.

Bogues had previously received infractions in July, 2011 for spitting on an inmate and correctional officer (ECF 61-5, ¶6 & p. 12); in February, 2011 for spitting on another inmate (*Id.*, ¶ 6, p. 20); and in July, 2008 for fighting with his cellmate who was found standing over Bogues in their cell (*Id.*, ¶ 6 & p. 29).

Soltas avers that he had no prior knowledge that Bogues would harm Stewart.  He specifically denies threatening that Bogues would harm him.  ECF 32-5, ¶ 4.  Soltas also denies failing to remove Stewart's restraints when he was placed in the cell with Bogues.  *Id.*, ¶ 6.  Soltas declares that Stewart never expressed to him that he believed he was at a higher risk of victimization.  ECF 61-19, ¶ 3.

Puffenbarger avers that she too had no prior knowledge that Bogues would assault plaintiff nor did she have any reason to believe Bogues would assault plaintiff.  ECF 32-6, ¶ 4.  She further denies any knowledge that a staff member placed a hit on Stewart or in any way attempted to coerce Bogues into assaulting Stewart.  *Id.*, ¶ 5.

---

[9] It appears that Bogues was not added to Stewart's enemy list until August 31, 2015, almost one year after the assault. ECF 61-16, p. 39.

Officer Frantz avers that he was on leave on September 29, 2014, and therefore not at NBCI on the day of the assault.[10] ECF 47-4, ¶ 4. The Post Assignment Work Sheet confirms that Frantz was not on duty on that day. ECF 47-5. Frantz further avers that Stewart did not communicate to him that he believed he was a higher risk of victimization. ECF 61-19, ¶ 3.

Detective Sergeant Scott Peterson avers that he has been an internal investigations detective for fifteen years. ECF 47-3, ¶ 2. He was assigned to investigate the September 29, 2014 assault. During the investigation Peterson interviewed Stewart twice. *Id.* Stewart did not allege that correctional staff acted improperly in regard to the assault, nor did plaintiff ask him to file charges against anyone other than Bogues. *Id.*

## D.    October 16-18, 2015 Assault

Prior to the assault on Stewart by Kitchen, defendants each aver that they had no knowledge that Kitchen posed a risk of harm to Stewart. Stewart II, ECF 21-2, ¶ 7; ECF 21-3, ¶ 6; ECF 21-4, ¶ 7, ECF 21-5 ¶ 5; ECF 21-6, ¶¶ 6 & 7; ECF 21-7, ¶ 4.

Detective Scott Peterson of IIU was notified on October 19, 2015, that Stewart alleged his cellmate Tremaine Kitchen had been raping him from October 17, 2015 to October 19, 2015. ECF 21-8, p. 7. Peterson interviewed Stewart at the WMMC. Stewart's claims regarding the assaults were inconsistent. He advised that he had been sexually assaulted by his cellmate several times by penetration, although he was not sure what had done the penetration. He claimed he was assaulted in bed and was overpowered due to his suffering from cancer. *Id.*, p. 8. He also stated he was subjected to a choke hold and an object shoved in his rectum. *Id.* The second assault occurred the next day when Stewart claims he was wrestled to the floor and an object was placed in his rectum. *Id.* Forensic Nurse Debi Wolford examined Stewart. Stewart advised her that

---

[10] In his opposition response, plaintiff concedes that he no longer has a claim against Frantz, that it was a mistake "assuming Frantz was present." ECF 50, p. 2.

Kitchen used his penis during the second assault. *Id.*, p. 9. Wolford reported that Stewart later added that he may have been penetrated by an object only after Dr. May asked if it could have been an object. *Id.* In a written statement provided by Stewart, he stated he was penetrated by a penis. *Id.*, p. 27. The examination revealed that Stewart had 3 small tears outside of his anus. *Id.*, p. 9.

Peterson inspected Stewart's cell which was neatly arranged. *Id.*, p. 9. No evidence was found within the cell. Peterson interviewed Kitchen who denied the assault and stated, "He does this to every cell guy he's celled with!" *Id.*, p. 11. Kitchen declined further questioning without a lawyer. *Id.* He had previously provided a written statement claiming:

> Nothing happened between me and Inmate Maurice Stuart. I never touched him; made any advances at him nor did I have sexual relations with him by no means. Mr. Stuart had personally explained to me that he is going to get even with Sgt. Puffenburg for placing him into cells with inmates who she can get to fight him. Mr. Stuart also explained that he will be doing anything to get a single cell because he does not want any cell mates so to strengthing (sic) his civil action 1983 against Sgt. Puffenburg he professed to me that he was going to jump on his next cell mate and say that Sgt. Puffenburg placed him inside of the cell to assault him.

*Id.*, p. 26. Given the lack of evidence, Stewart's allegations of rape were found unsubstantiated. *Id.*, pp. 12, 14.

## E.   Cell Assignments

In order to address safety and security concerns of inmates, DPSCS uses a number of processes including: annual classification reviews; monthly case management reviews of inmates housed on segregation; placement on administrative segregation so that safety issues can be addressed; investigation by DPSCS's IIU; as well as the administrative remedy process where inmates may file complaints. Stewart I, ECF 61-3, ¶ 4 (Bishop Declaration); ECF 61-4. Stewart

underwent annual security reclassifications in August 2012, August 2013 and again in October 2014. ECF 61-16, pp. 50-53.

In cases where inmates are verified as enemies, that information is available to case managers and other correctional staff while making classification and housing decisions. ECF 61-3, ¶ 4. Inmates are directed to communicate safety concerns with case management who will address the issue. *Id.* Where an inmate reports a sexual assault the claim is immediately referred to IIU for investigation and any necessary referral. *Id.*

Inmates are provided medical and psychological services. *Id.*, ¶ 5. Medical personnel are authorized to order a medical or single cell. *Id.* The medical and psychological staff are trained regarding the processes DPSCS has  in place for investigation and evaluation of claims by inmates who express fear of victimization. *Id.*

Staff of the Psychology Department assess inmate's mental health and provide mental health care as appropriate. Stewart II, ECF 21-7, ¶ 3. Bruce Liller, Director of Mental Health Programs at NBCI avers that a point of emphasis in planning treatment is the importance of double celling as a way to improve the prisoner's ability to make progress. *Id.* Psychology and correctional staff work to find compatible cellmates *Id.* Liller indicates that such planning requires cooperation and motivation form the inmate. *Id.* Stewart, however, "has a history of refusing to cooperate with this effort and is fixated on obtaining a single cell." *Id.* In support of Stewart's efforts to obtain a single cell, he exaggerates symptoms, uses PREA claims, and demonstrates an overall pattern of resistance in an effort to control his housing assignment. *Id.*

Norma Holwager, a Licensed Clinical Professional Counselor, avers that she is familiar with Stewart's complaints. Stewart I, ECF 47-2, ¶ 1. Holwager indicates that an important consideration in inmate housing occurs when an inmate declares a suicidal ideation. In that

16

circumstance, placement in a single cell is not recommended as it may increase the opportunity for self-harm. *Id.* Holwager avers that she has provided Stewart opportunities to address his mental health concerns and he has been offered mental health care consistent with his needs. *Id.*, ¶ 3. Based on Stewart's psychological needs, Holwager determined there was no basis to order a single cell. *Id.* Holwager further indicates that she is aware that Stewart has raised concerns about gangs which have been investigated numerous times by staff at NBCI. *Id.*, ¶ 4.

Defendants indicate that at the time of the September 2014 assault by Bogues, Stewart was not in medical need of a single cell. They note that this court reviewed Stewart's medical care from July 12, 2013 to June 18, 2014, in *Stewart v. Davis, et al.*, Civil Action No. JFM-14-570 (D. Md), ECF 30, pp. 18-29. Stewart was ambulatory in September of 2013, January 4, 2014, and February of 2014. *Id.*, pp, 19, 22, 24.

On June 25, 2014, Michael Llewellyn, Esquire wrote the Assistant Warden at the Western Correctional Institution indicating that Stewart believed he needed a single cell for medical reasons. ECF 61-13, pp. 1-2. Case Management manager Rich S. Roderick advised Mr. Llewellyn that Stewart had been transferred to NBCI; that Stewart's case was being reviewed and monitored, and that Stewart's need for a single/medical cell had not been verified. *Id.*, p. 3. Roderick further advised that medical staff would alert custody and/or case management should Stewart require a single cell. *Id.*, p. 3. Medical reports confirm the lack of need for a single or medical cell. ECF 61-14. On July 21, 2014, it was noted that plaintiff was ambulating with a cane and did not need a wheelchair or medical cell. *Id.*, p. 2. On July 25, 2014, it was noted that Stewart was able to get on and off the examination table without difficulty. *Id.*, p. 7. Medical staff specifically found that Stewart had no need for a medical cell. *Id.*

Photographs of Stewart taken on September 22, 2014, show that he was not a slight or small person. Stewart I, ECF 61-16, pp. 12-15. On September 24, 2015, Soltas, in describing Stewart's attack on his cellmate, reported that Stewart was ambulatory, had a cane, and repeatedly kicked his cellmate Robert Moore, *Id.*, p. 27. Plaintiff was described as combative on that day and lunging out of his cell. *Id.*

At the time of the October 2015 assault, medical staff reported that while Stewart suffered from skin cancer on a small area of his back (Stewart II, ECF 21-8, p. 11), the cancer did not effect his strength or stamina. *Id.* Photographs of Stewart after the October 2015 assault again show that he was not a slight person. *Id.*, p. 31.

NBCI does not have a "Protective Custody" tier or unit, however, Stewart has been housed on administrative segregation in a single cell since October 19, 2015. ECF 21-2, ¶ 6.

## IV. Standard of Review

A.    **Motion to Dismiss**

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b) (6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-62 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 562. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see*

18

*United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

In reviewing the complaint in light of a motion to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,  555 (2007) (internal citations omitted). Nonetheless, the complaint does not need  "detailed factual allegations" to survive a motion to dismiss. *Id.* Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. Thus, a complaint need only state "enough facts to state a claim to relief that is plausible on its face." *Id.* 570.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility

of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to

relief.' " *Id*. at 679 (quoting Fed.R.Civ.P. 8(a)(2)).

**B.      Motion for Summary Judgment**

  Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that
> there is no genuine dispute as to any material fact and the movant is
> entitled to judgment as a matter of law.

  The Supreme Court has clarified that this does not mean that any factual dispute will

defeat the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

  "The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The

court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all

inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

20

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## V. Analysis

### A.    Failure to Protect

Stewart alleges that correctional defendants were deliberately indifferent in forcing him to double cell thus failing to protect him from a known risk of harm. As such his right to be free from cruel and unusual punishment has been violated. The right to be free from cruel and unusual punishment includes the right to be protected from a substantial risk of serious harm at the hands of other inmates. *See Farmer v. Brennan,* 511 U.S. 825 (1994); *Makdessi v. Fields*, 789 F.3d 126 (4th Cir. 2015); *Winfield v. Bass*, 106 F.3d 525, 531 (4th Cir. 1997); *Belcher v. Oliver,* 898 F.2d

21

32, 34 (4th Cir. 1990).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016), citing *Farmer*, 511 U.S. at 832. Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id.* "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victims safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk to either injury. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014). The objective inquiry requires this court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment. *Raynor*, 817 F.3d at 128.

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of

a substantial risk 'in the usual ways including inference from circumstantial evidence" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128.

Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844. "In failure to protect cases, prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." *Raynor*, 817 F.3d at 128 (internal quotation marks omitted) (quoting *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995)). Failure to take any action in an ongoing assault, however, can amount to deliberate indifference. *See Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997).

Stewart's bald claims that he was placed into the cell handcuffed are unsupported by the record evidence. Officer Murray advised the IIU investigator that he was called to Stewart's cell after Officer Mallow found Stewart injured in the cell. He stated that after the inmates were handcuffed he escorted Stewart to the medical room, contradicting Stewart's claim that he was placed in the cell in handcuffs. ECF 32-3, p. 10. Soltas specifically denies placing Stewart in the cell in handcuffs. ECF 32-5. Additionally, Stewart never advised the IIU investigator or medical staff that he was placed in the cell with handcuffs. ECF 32-3.

Stewart's assertions that defendants were aware of a substantial risk to his safety due to the alleged "hit" placed on him by the BGF as well as an alleged conspiracy amongst correctional staff to cause him harm is simply not supported by the record. Stewart's long standing claims that he is the subject of a BGF hit have been investigated numerous times by correctional staff and

have never been substantiated.[11]

Stewart argues that Bogues was a member of BGF at the time of the September 29, 2014 assault in an apparent effort to support his claim regarding the BGF hit. While defendants dispute that Bogues remained a validated member of BGF at the time of the assault, this dispute is not material to the disposition of this case. Even if Bogues was a validated member of BGF at the time of the assault there was simply no information from which correctional staff could have drawn an inference that it was unsafe to place Stewart in the cell with Bogues as there had never been any substantiation of Stewart's claim that the BGF was after him.[12] Rather, the record is replete with information that defendants, including medical and psychology staff, believed that Stewart's regularly repeated claims of problems with other inmates and staff stemmed solely from his desire to be single celled, rather than from a true threat of harm.

Similarly, there is nothing in the record to suggest that defendants were aware of a risk of harm posed to Stewart by housing him with Kitchen in October of 2015. Kitchen was not a member of a STG, nor was he a known enemy of Stewart's. Each defendant named in Stewart II denies having any knowledge that Kitchen posed a risk of harm to Stewart.

To the extent Stewart alleges defendants failed to protect him by not providing him a single medical cell, his claim is also unavailing. There is no evidence that any of the named defendants, although aware of Stewart's stated belief that he needed to be single celled, agreed with Stewart's claims, or should have agreed with Stewart's assessment of the risk to his safety. Unless a prison official actually makes the inference, he does not act with deliberate indifference,

---

[11] This court previously considered Stewart's claims that correctional staff failed to protect him from harm due to alleged problems with prison gangs and found Stewart's claims unsupported by the record. *See Stewart v. Warden,* Civil Action No. JFM-10-2926 at ECF 39 (D. Md.) (finding defendants acted to investigate plaintiff's claims regarding alleged problems with prison gangs which were ultimately found to be baseless).

[12] It is noteworthy that Stewart's assigned motivation for the assault by Bogues has varied to include claims that it was the culmination of a BGF hit, another inmate directed Bogues to perform the act, and correctional staff paid Bogues to perform the attack.

even where his actions violate prison regulations or can be described as stupid or lazy. *Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997); *see also Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) ("[T]he fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety.").

Here defendants reasonably believed that Stewart could be safely housed with other inmates. Correctional staff, having investigated but unable to substantiate any of Stewart's claims, clearly had no basis to believe a single cell was necessary. Stewart's claim that he was easily victimized due to his poor health is likewise not supported by the record. Medical staff examined Stewart close in time to the assaults and specifically found he did not need a single/medical cell. Additionally, psychology staff found that single celling was not necessarily in Stewart's best interest due to his stated suicidal ideation and that, in general, double celling was beneficial to inmates.

Despite Stewart's desire for a single cell and his numerous complaints endeavoring to obtain one, there is no objective evidence that defendants knew that Stewart faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures. "Prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "reasonable safety" *Farmer* 511 U.S. at 844. Here, each of Stewart's claims of assault were investigated and he was placed on administrative segregation while his claims were investigated. His known verifiable enemies were placed on his enemy report. He was moved between institutions and on and off segregation status to keep him away from known risks of harm. He received regular follow up with mental health and medical staff who both independently determined that he did not fulfill the criteria to

be single/medically celled. There is no free standing right to a single cell while incarcerated. *See e.g. Williams v. Bishop*, 2014 WL 4332427, at * 6 (D. Md. Sept. 16, 2014) ("A prisoner's strong desire to be in a single cell, based on his belief that his medical conditions cause difficulties with cellmates, does not entitle him to housing in a single cell unless medical providers have made a directive for a single cell based on a medical need."). Stewart has failed to demonstrate that he was entitled to a single cell due to a credible threat to his safety or due to his medical needs. He has also failed to demonstrate that defendants were aware of a risk of harm to him and disregarded it. In light of the foregoing, defendants are entitled to summary judgment in regard to plaintiff's failure to protect claims.

**B.     Personal Participation**

It would appear that Stewart has named Wardens Bishop, Stouffer and Shearin solely on the basis on their rolls as Wardens who oversee the running of the institution. It is well settled however, that *respondeat superior* is not applicable in Section 1983 actions. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663, n. 7 (1978); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no *respondeat superior* liability under § 1983). As such, Bishop, Stouffer and Shearin cannot be held liable based on their position as supervisors of the prison.

Officer Frantz was not on duty at the time of the September 29, 2014 incident. Stewart concedes as such. Liability under §1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Frantz is entitled to dismissal.

**C.     Maryland Division of Correction**

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89,

100 (1984).  While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court.  Thus Stewart's complaint against Maryland Division of Corrections, a State agency, is barred by the Eleventh Amendment.

**D.    Failure to Provide Records**

Stewart indicates his desire to withdraw his claim against Carter for failure to provide records.  Accordingly, the claim against Carter shall be dismissed.  Had Stewart not withdrawn the claim, it would be subject to dismissal.  Stewart has failed to allege a deprivation of any federal right conferred by the constitution or statue which would entitle him to relief under § 1983 in regard to failure to provide records under the Maryland Public Information Act.  *See Baker v. McCollan*, 443 U.S. 137 (1979) (1983 is not itself a substantive right but a means of vindicating rights guaranteed by the Constitution or federal law).  Violations of State laws or regulations do not provide a basis for a due process claim.  *See Weller v. Dept. of Soc. Services*, 901 F. 2sd 387 (4th Cir. 1990).

**E.    Failure to Prosecute**

To the extent Stewart seeks a criminal prosecution of others; he has no legally protected interest in the prosecution of others.  The Supreme Court said in *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973): "[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *See also Sattler v. Johnson,* 857 F. 2d 224, 227 (4th Cir. 1988)*; Banks v. Buchanan*, 336 Fed. App'x 122, 123 (3rd Cir. 2009); *Sargeant v. Dixon*, 130 F.3d 1067, 1069 (D.C. Cir. 1997); *Sibley v. Obama*, 866 F. Supp.2d 17, 20 (D.D.C. 2012).  As such, Stewart's claim against Peterson shall be dismissed.

**VI. Conclusion**

27

For the reasons stated, defendants' dispositive motions shall be granted.[13] A separate order shall be entered in accordance with this memorandum.


Date: _____                    _____
                                            J. Frederick Motz
                                            United States District Judge

---

[13] Having found no constitutional violation the court need not address defendant's qualified immunity defense.